Cheshire,
No. 5079.

PEERLESS INSURANCE COMPANY

*v.*

TRAVELERS INSURANCE COMPANY & a.

Argued November 8, 1962.

Decided February 21, 1963.

412

*Faulkner, Plaut, Hanna & Zimmerman* (*Mr. N. Michael Plaut* orally), for the plaintiff.

*Booth, Wadleigh, Langdell, Starr & Peters* and *Robert L. Chiesa* (*Mr. Chiesa* orally), for the defendant Travelers Insurance Company.

*George P. Cofran* and *L. Wilder Quint* (*Mr. Quint* orally), for the defendant Merchants Mutual Insurance Company.

*Bell & Bell* and *Peter S. Espiefs* (*Mr. Ernest L. Bell III* orally), for the intervenor Goewey.

PER CURIAM. The findings of the Trial Court with reference to the circumstances preceding the accident were in part as follows: "[Barrie G. Barrett, Sr.] took the car to try it out on or about August 1st or 2nd, 1960, and he had it continuously in his control and possession until August 7, 1960, the date and time of the accident which resulted in the injuries to the intervenor, Beverly Goewey.

"On Wednesday night, August 3, 1960, Barrie G. Barrett, Sr. told the general manager of Elmwood Pontiac, Inc., John Kononan, that he wanted to buy the 1955 Chevrolet. He was advised that it would be necessary to have his father, Raymond Barrett, come in, and on Thursday evening August 4, 1960, Barrie G. Barrett, Sr. and . . . Raymond Barrett signed four forms which had not been completed at the time of his signing; and he also signed a customer's statement, which had been filled out partly in the handwriting of Raymond Barrett and partly in the handwriting of John Kononan. No money was paid down at this time.

"[Raymond Barrett] had, previous to the signing, advised Mr. Kononan that the proceeds from the collision insurance on the 1954 automobile would be paid over as the down payment when it was received. Mr. Kononan then advised Raymond Barrett and Barrie G. Barrett, Sr. that the ten-day plates would be ready on Friday, and the testimony was that the arrangement was that they were to be picked up by Barrie G. Barrett, Sr. on Friday. There was also some discussion of the down payment coming from the collision insurance. The certificates for the ten-day plates, dated August 5, 1960, were made out by the salesman, Mr. Boccia, and the ten-day plates were stamped by Mr. Kononan and left on the desk of Mr. Kononan. At some time the certificates for the ten-day plates were mailed, and they were received by the Registry of Motor Vehicles on August 11, 1960.

"Barrie G. Barrett, Sr. testified that he went to Elmwood Pontiac, Inc. on Friday to pick up the plates but he did not pick them up on Friday night, and although he passed the Elmwood Pontiac's premises on the morning of August 6, 1960 several times, and lived only a quarter of a mile, more or less, from the garage, he did not pick up the plates. He did not have the down

payment on Friday when he went to the garage to pick up the ten-day plates. On Saturday, August 6, 1960, he decided to go to Carthage, New York . . . with the dealer plates on the car. He never mentioned the trip to Carthage to anyone at the garage. He did go to Carthage, New York, with the dealer plates on the car and the accident· in question occurred on the return trip. Raymond Barrett and John Kononan first learned of the accident on August 8, 1960.

"Raymond Barrett brought the collision insurance check . . . when it was received by him, and gave it to John Kononan because he had 'given his word.' John Kononan had been informed on Friday that the New Hampshire Finance Company would accept the finance papers, and he, John Kononan, testified that he telephoned Raymond Barrett on Friday, August 5th, and so informed ·him. Raymond Barrett, in his testimony, denied that there was any such telephone call or conversation.

"The witnesses testified that they did not know what happened to the ten-day plates, but all were agreed that the ten-day plates were never attached to the 1955 Chevrolet car . . . . "

The Court also found and ruled as follows:

"On all the evidence the Court finds that it is more probable than otherwise that the down payment on the 1955 Chevrolet was to be made by the proceeds of the collision insurance on the 1954 Chevrolet, and that the ten-day plates were to be picked up and attached to the 1955 Chevrolet at the time of ·the making of the down payment, and that it was the intent of the parties that the sale was to be completed at that time; that this not having been done at the time of the accident the defendant Elmwood Pontiac, Inc. was the owner of the 1955 Chevrolet.

"The Court finds that Barrie G. Barrett, Sr. had permission to operate the motor vehicle in question in Keene and its environs. The Court further finds that the trip to and from Carthage, New York was beyond the scope of the expressed or implied permission given to Barrie G. Barrett, Sr. to use the 1955 Chevrolet . . . . "

We are of the opinion that the finding and ruling that Elmwood Pontiac, Inc. was the owner of the 1955 Chevrolet at the time of the accident was warranted by the evidence, and the exceptions thereto are overruled. The evidence indicated that on Thursday, August 4, 1960, the parties agreed upon the terms of the sale, including the price of $775, and that the necessary papers were executed. However, no down payment was then made and it

was understood that this would be met in major part from proceeds of collision insurance on the 1954 Chevrolet payable to the defendant Barrett's father. Had the parties intended to transfer title before payment, it was reasonable to assume that the temporary plates would have been issued when the papers were executed on August 4, 1960. Instead it was then proposed that the temporary plates should be made available and the down payment made upon the following day.

Payment in the sum of $420 was received by Elmwood Pontiac, Inc. from New Hampshire Finance Company on Saturday, August 6, 1960. However the down payment to be made by the Barretts had not then been received, and the defendant Barrett had not been furnished with temporary plates, but remained in possession of the vehicle and the dealer's plates. In fact, the collision insurance check for $320 was neither issued, nor delivered to Elmwood Pontiac, Inc., until after the accident. The evidence as a whole warranted the finding and ruling that title remained in Elmwood Pontiac, Inc. at the time of the accident on Sunday, August 7, 1960.

The decisive question then becomes whether the record sustains the finding of the Trial Court that the trip to Carthage, New York, was "beyond the scope of the expressed or implied permission" given to Barrett to use the car. It appears that Barrett took the automobile to try it out on either Monday, August 1, or Tuesday, August 2. From then on, it was constantly in his possession and control until Sunday, August 7, the day of the accident. At no time, either when the car was first turned over to him at the garage or thereafter, were any restrictions placed upon his use of it. In fact, nothing whatsoever was said to him bearing upon this matter, by anyone.

As early as Wednesday night, August 3, Barrie told Kononan, who was general manager in complete control of sales at Elmwood, that he wished to buy the Chevrolet. He was advised that as a minor it would be necessary for him to have his father, an old and respected customer of Kononan's, sign the conditional sale contract. This the father did the next day. At that time the parties all expected the check for $420 from the New Hampshire Finance Corporation to be delivered shortly. Actually, the finance company approved the loan and issued its check payable to Elmwood, on Friday, August 5. The Barretts also told Kononan that the check for $320, representing the insurance on Barrie's

previous car, would be delivered to Elmwood within a few days — which it was. But previously, on Saturday, August 6, the day when Barrie left for Carthage, the cash receipts journal of Elmwood shows that it received and credited the $420 check toward the purchase price of the car.

The situation presented is a practical one which should be dealt with accordingly. The car was turned over to a young man — still a minor — with no restrictions whatsoever on its use, and allowed to remain wholly in his possession and control for nearly a week and until the time of the accident. The seller had received over half the purchase price and assurances that the balance would be paid shortly. Elmwood Pontiac, Inc. was in the business of selling cars and it was its policy to do "everything reasonable" to accomplish this end. It was not only in its interest to satisfy the defendant Barrett, but also his father, a valued customer who had shown his desire that his son should have the car. Cf. *Travelers Ins. Co.* v. *Marcoux*, 91 N. H. 450, 452. Though the Court found that title had not passed, yet for all practical intents and purposes the sale was a certainty. Kononan testified that on Friday, August 5, "it [the deal] was closed as far as we were concerned . . . . " In the minds of both parties, the Barretts were obligated to purchase the automobile. In all the circumstances, including the lack of any evidence that Elmwood placed any restrictions on its use, we believe that the record fails to support the finding that its use to make the two-day round trip to Carthage was beyond the scope of the permission given to Barrie Barrett.

On the contrary, it appears that implied consent to the trip was implicit in the course of conduct of the parties and the surrounding circumstances. *Standard &c. Ins. Co.* v. *Gore*, 99 N. H. 277, 282; 7 Appleman, Insurance Law & Practice, s. 4365; see also, 45 C.J.S. 897, 898. This is so regardless of the fact that Elmwood was not notified of Barrie's plans in advance. *Standard &c. Ins. Co.* v. *Gore, supra*, 282; *Massachusetts Bonding &c. Co.* v. *Burrows Motor Co.*, 104 N. H. 417. See *Aetna Life Insurance Co.* v. *Chandler*, 89 N. H. 95, 99. It was reasonable to suppose, in view of the situation in its entirety, including the previous conduct of the parties and Kononan's conviction that the deal "was closed" as far as Elmwood was concerned, that express permission would not have been refused to Barrie Barrett had he requested it. See 7 Appleman, Insurance Law &

Practice, s. 4367. It follows that the Court's finding that "the trip . . . was beyond the scope of the . . . permission given" cannot be upheld. See *Am. Employers Ins. Co.* v. *Insurance Co.*, 93 N. H. 101.

Since the only finding which the evidence would warrant is a finding that the defendant Barrie Barrett had the permission of the owner to make the actual use which was being made when the accident occurred, it follows that the defendant The Travelers Insurance Company is obligated to defend the pending action brought by the intervenor Goewey, and to satisfy any judgment therein, up to the limits of coverage provided. It likewise follows that the plaintiff Peerless Insurance Company is secondarily liable, and obligated to pay within the limits of its policy so much of any judgment as exceeds the limit of coverage provided by The Travelers Insurance Company. The defendant Merchants Mutual Insurance Company is under no obligation either to defend or to pay any judgment in the pending action.

*Remanded.*

All concurred.